DON E. NELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nell v. Commissioner
Docket No. 26184-83.
United States Tax Court
T.C. Memo 1986-246; 1986 Tax Ct. Memo LEXIS 365; 51 T.C.M. (CCH) 1219; T.C.M. (RIA) 86246; June 17, 1986. Robert J. Degroot and Robert J. McKenna (specially recognized), for the petitioner. Daniel K. O'Brien and William S. Garofalo, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's individual income tax for the calendar years 1968 and 1969 in the respective amounts of $66,225.39 and $4,178.86, together with additions *366 to tax for each year under the provisions of section 6653(b) [1] in the respective amounts of $33,112.69 and $2,089.43. By amendment to his answer filed at the time of trial, respondent affirmatively alleged, in the alternative, that if respondent's determination of additions to tax under section 6653(b) were disapproved, petitioner was liable for additions to tax for each year under the provisions of section 6651 and section 6653(a). The issues which we must determine are: 1. Whether petitioner filed an income tax return for the calendar year 1968; 2. Whether petitioner had unreported taxable income in the years 1968 and 1969, resulting from certain sales of stock owned by petitioner in each year, as well as additional income from certain unidentified bank deposits in the year 1968; [2]
3. Whether petitioner is liable for additions to tax for fraud, under section 6653(b), for either or both of the years 1968 and 1969; and 4. In the alternative, in the event that additions to tax under section 6653(b) for either year are disapproved, whether petitioner is liable in either such year for additions to tax under section 6651(a) and/or section 6653(a). *367 The evidence herein was stipulated in part, and such facts, together with stipulated exhibits, are incorporated herein by this reference. FINDINGS OF FACT At the time of filing his petition herein, petitioner Don E. Nell was a resident of Elizabeth City, North Carolina. For the calendar year 1968, petitioner timely filed an individual income tax return as an "unmarried head of household," although at that time he was married to Audrey Nell. Such return showed a total tax liability of $2,545.17. After correcting such amount to $2,311.11 because of a mathematical error, respondent assessed the tax and credited petitioner's account for payment thereof through payments by petitioner and withholding on his salary, as reported.Said return reported, inter alia, wages or salary of $16,000 and a net loss from certain rental property in the amount of $1,663.93. No income from dividends or interest was reported, nor any capital gains or losses. For the year 1969, petitioner did not file an income tax return. From approximately 1962 through October of 1967, petitioner was vice president of Datacomp Service Corporation, Inc., a New York corporation. In the early part of November 1967 *368 a new corporation of the same name, Datacomp Service Corporation, was formed in the State of New Jersey and took over all of the assets and liabilities of the New York corporation. On November 16, 1967, the new New Jersey corporation (hereinafter "Datacomp") issued 31,625 shares of its common stock to petitioner, in return for petitioner's promissory note payable to Datacomp in the amount of $3,162.50. On May 9, 1968, Datacomp entered into an agreement with the Dumont Corporation of Salt Lake City, Utah, (hereinafter "Dumont") whereby Dumont "purchased" all of the assets of Datacomp in exchange for 3,563,573 shares of class A common stock and 330,349 shares of class B common stock of Dumont. In connection with this acquisition, the original shareholders of Datacomp received 5.2 shares of Dumont stock for each share of Datacomp common stock held. As the result of this exchange of stock, petitioner, as of May 10, 1968, owned 167,050 shares of class A common stock of Dumont. On that same date, petitioner was elected vice president and a director of Dumont. Petitioner was named president of Dumont in August of 1968 and continued in that capacity through November 30, 1968, when he *369 terminated his connection with Dumont. After the May 9, 1968, acquisition of Datacomp by Dumont, the bid price for Dumont stock on the open market increased in accordance with the following listed summary: Date
Bid Price
May 3, 1968
1 3/8
May 16, 1968
3 3/4
June 16, 1968
9 1/4
October 15, 1968
10 1/2
Orders suspending all trading in securities of Dumont were issued by the Securities and Exchange Commission on November 1, 1968. Margarete Contento (hereinafter "Contento") is a woman who for part of 1968 worked as a waitress in a restaurant in Englewood Cliffs, New Jersey. She worked for a salary and tips. In 1969, she was unemployed.She is a woman of limited education and little, if any, knowledge of investment, financial and tax affairs. She had no significant funds of her own. At some point in 1968, petitioner formed a liaison with Contento and moved in to her rented apartment in Paterson, New Jersey, where he lived with her as man and wife, together with Contento's son and two grandchildren. In 1969, petitioner, Contento, et al., moved to a single family house in Creskill, New Jersey. In the latter part or 1969, the house was damaged by fire, at *370 a time when petitioner and Contento were absent. At some point in 1968, and after receiving his 167,050 shares of Dumont stock, petitioner caused one-half thereof, or 83,525 shares, to be transferred to the name of Contento. [3] The latter paid no consideration for the transfer of said stock to her, and at all relevant times acted as petitioner's nominee and subject to his direction and control, with respect to the stock and any proceeds therefrom. Petitioner caused Contento to open a stock brokerage account in 1968 in her name with the firm of Hardy & Company. Through this account, in the period August 30, 1968, through December 3, 1968, petitioner caused Contento to sell the following stocks at various times, in the following total amounts: Shares and Company
Cost [4]
Sales Price
6,900
Dumont
$690.00
$58,695.13
1,000
Spooner Mines
2,835.00
3,755.00
200
National Food Marketers
2,933.50
2,354.50
200
Addressograph-Multigraph
17,933.34
15,076.49
TOTAL SALES
$79,881.12
*371 During that same year, Hardy & Company made disbursements to Contento with respect to transactions through the account in the total amount of $55,679.89, which were deposited in various bank accounts maintained in the name of Contento. Petitioner actively participated in maintaining the check ledgers and in drawing checks for Contento's signature, and substantial amounts from these accounts were paid to him or for his benefit. In 1968, petitioner caused Contento to open a stock brokerage account with the firm of Merrill, Lynch, Pierce, Fenner & Smith, Inc. During the period June 25, 1968, through December 31, 1968, petitioner caused Contento to make the following sales of stocks through this account, at the following prices: Shares and Company
Cost [5]
Sales Price
1,600 Dumont
$160.00
$12,552.42
100 National Food Marketers
1,496.75
1,350.50
TOTAL SALES
$13,902.92
During the year 1968, Merrill, Lynch, Pierce, Fenner & Smith, Inc. made disbursements to Contento with respect to sales of stock through the account in the total amount of $13,902.42. Of this amount, two checks *372 totaling $5,394.61 were cashed, and the balance was deposited in various bank accounts maintained in the name of Contento. In 1968, petitioner caused Contento to open a stock brokerage account with the firm of Orvis Bros. & Co. In 1969, petitioner caused Contento to sell 3,000 shares of Silver Mac Mines stock through this account, with a cost of $1,103.63, at a sales price of $1,562.26. During the year 1969, Albert W. Dugan of Houston, Texas, purchased Dumont Corporation stock on three occasions, as follows: (a) On or about April 14, 1969, Mr. Dugan paid petitioner $7,000 for an undisclosed number of shares of Dumont. (b) On July 14, 1969, Mr. Dugan paid petitioner $5,000 for the purchase of 10,000 shares of Dumont. (c) On August 18, 1969, petitioner and Contento appeared personally in Mr. Dugan's office in Houston, Texas, at which time Mr. Dugan delivered a cashier's check to petitioner in the amount of $2,500 for the purchase of 10,000 shares of Dumont, and a further cashier's check in the amount of $5,000 for the purchase of 20,000 shares of Dumont, said check being payable to Contento at petitioner's direction. The above sales of Dumont stock to Mr. Dugan were negotiated *373 on his behalf by a Mr. Gearhart (now deceased) who was a personal friend of Mr. Dugan's. [6]
The same Mr. Gearhart was also a friend of a Dr. William Bloom who, in 1969, was a practicing physician in New York City. Apparently through the intermediation of Mr. Gearhart, Dr. Bloom purchased Dumont stock from petitioner (whom he never met) on or about October 1, 1969, at a price of $2,000 for an undisclosed number of shares. [7]
On or about September 12, 1969, one William Howard (now deceased) purchased 12,000 shares of Dumont stock which was registered in the name of Contento for a price of 3,000. The sale was arranged by Mr. Howard's brother, Charles Howard, with petitioner, with the participation in some undisclosed fashion of Dr. Bloom and Mr. Gearhart. [8]
The purchase of the house at Creskill, New Jersey, in which petitioner and Contento lived in 1969, was arranged by petitioner, with title thereto being put in Contento's name. Contento supplied no funds *374 of her own for this purchase, and all necessary funds were supplied by petitioner through accounts maintained in the name of Contento, described above. In his statutory notice of deficiency herein, respondent determined that petitioner had unreported short-term gains from the sale of securities in 1968 as follows: Number of
Short Term
Description
Broker
Cost
Shares
Gain or Loss
Spooner Mines
Hardy & Co.
$2,835.00
1,000
$ 920.00 National Food
Market
Hardy & Co.
2,993.50
200
(639.00)
National Food
Market
MLPF&S *
1,496.75
100
(146.25)
Addressograph-
Multigraph
Hardy & Co.
17,933.34
200
(2,836.85)
Dumont Corp.
Hardy & Co.
6,900
58,695.13 Dumont Corp.
Hardy & Co.
1,600
15,232.16 Dumont Corp.
MLPF&S *
1,600
12,552.42 Total Short Term Gain
$83,777.61 In his statutory notice herein, respondent determined that petitioner had unreported long-term capital gains from the sale of securities in 1969 as follows: Description
Shares
Cost
Selling Price
Dumont Corp.
24,000
$14,500.00 Dumont Corp.
8,000
2,000.00 Dumont Corp.
12,000
3,000.00 Dumont Corp.
10,000
2,500.00 Dumont Corp.
10,000
3,000.00 Dumont Corp.
20,000
5,000.00 National Food
100
$1,522.00
1.75 Silver Mac Mines
3,000
1,103.63
458.63 Total Long Term Capital Gain
$30,460.38 Less: Section 1202 deduction - 50%
(15,230.19)
Taxable Long Term Capital Gain
$15,230.19 *375 In his statutory notice herein, respondent determined that petitioner had unreported income in 1968 from unexplained bank deposits in the following bank accounts on the following dates, in the following amounts: Date of
Bank
Deposit
Amount
Englewood National Bank
7/30/68
$2,500.00
Acct. #301-00421-8
9/09/68
5,974.29
Kings County Lafayette Trust
11/04/68
2,000.00
Acct. #03-005-2866
Fort Lee Trust Co.
4/10/68
1,000.00
Acct. #01-4950-0
10/24/68
2,000.00
11/01/68
2,000.00
12/13/68
2,000.00
Total Unidentified Unreported Income
$17,474.29
With respect to the bank accounts in the above table, the Englewood National Bank account was maintained in the name of Contento; the Fort Lee Trust Co. account was in the name of petitioner; and the name in which the account at Kings County Lafayette Trust was maintained is not disclosed in this record. There was an underpayment of tax by petitioner in each of the years 1968 and 1969, some part of which was attributable to fraud. OPINION Respondent determined in his notice of deficiency that petitioner had unreported taxable income in the form of short-term gains from the sales of securities *376 in 1968, as well as from certain unidentified bank deposits in that year. For 1969, respondent further determined that petitioner had unreported income from long-term capital gains resulting from the sales of certain other securities. These specific adjustments to petitioner's income for both years were detailed in respondent's statutory notice of deficiency, as shown in our findings of fact. The burden of proof was on petitioner to show error in respondent's determinations with respect to these adjustments, ; Rule 142(a). So far as petitioner is concerned, he has failed to carry that burden of proof. With respect to respondent's determination of securities sales in 1968, the records of the various brokerage houses, as detailed in our findings of fact, were introduced in evidence, and through them the sales of the relevant securities could be traced. For 1969, the same evidence was in the record, together with the direct testimony of Contento and other third-party witnesses with regard to the individual direct sales of Dumont stock in that year to Messrs. Dugan, Bloom and Howard. We think that the evidence in this record *377 -- mostly in the form of joint exhibits or testimony and evidence introduced by respondent -- clearly substantiates the bulk of the determinations with regard to securities sales, as determined by respondent. The evidence shows, as we have found, that in 1968 petitioner caused half of his Dumont shares to be put in the name of Margarete Contento, and that at all relevent times Contento served as petitioner's nominee or straw party for the purpose of effecting sales of securities which were really the property of petitioner. As part of this device, petitioner caused Contento to open and maintain various bank accounts, through which the proceeds of these sales, as well as perhaps other funds, flowed. The securities, and the proceeds of sales of securities, were nevertheless the property and the income of petitioner. Against this pattern of evidence, both documentary and through the testimony of witnesses at trial, petitioner, who had the burden on these issues, produced no evidence at all, except his unsupported and self-serving testimony that he had nothing to do with establishing the brokerage accounts in Contento's name, did not control the activity therein and had nothing to *378 do with the various bank accounts which Contento maintained. Petitioner's testimony at trial was vague, evasive, and frequently contradictory, and we find it generally unworthy of belief. Petitioner simply adopted the tactic of "stonewalling." He repeatedly declined to identify his signature as endorsements on numerous checks made out to him which were presented to him at trial, on the grounds that he could not identify his signature because he was not a handwriting expert. One does not have to be a handwriting expert in order to identify his own signature, and we are satisfied that petitioner was simply not telling the truth when he refused to identify his signature on the various checks which were presented to him in the course of trial. Again, in the face of direct and explicit testimony, both of Mr. Dugan and of Contento -- that they had met with petitioner in Houston, Texas, on a certain day, at which time Mr. Dugan bought Dumont stock, some registered in petitioner's name and some registered in Contento's name -- petitioner flatly denied that he had ever gone to Houston or had ever met Mr. Dugan. We think the weight of the evidence herein proves the contrary. Again, petitioner *379 denied at trial that he had ever filed a tax return for 1968, and denied what clearly appeared to be his signature on such return when it was introduced in evidence.Petitioner, however, never denied having filed a 1968 tax return up until the time of trial, including numerous prior interviews with respondent's agents with respect to his 1968 and 1969 tax affairs. Furthermore, petitioner on brief requested us to find that he had filed a Form 1040 for 1968, and at no time has petitioner ever disclaimed the credits to his 1968 account given by respondent based upon that return and the withholding and tax payments made therewith. Other instances in this record abound of petitioner's flat denials or evasions of facts which are otherwise clearly established in the record. We are the trier of facts. It is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we will or will not believe. We are not required to accept testimony at face value, and we may discount a party's self-interested testimony, and place our reliance on other testimony which we believe is more reliable. See , *380 affg. and remanding ; ; . We have accepted, then, that the securities sold through Contento's various brokerage accounts in 1968 and 1969 were in fact the securities of petitioner, and that the income was his, as determined by respondent, with the following exceptions: A. For the year 1968, our findings show the amounts of sales of securities, the prices received therefor and the costs, either as determined by respondent in his statutory notice or as conceded on brief, with the exception of the alleged sale of 1,600 shares of Dumont stock through the Firm of Hardy & Co., at a price of $15,232.16. With respect to this item, the transcript of the Hardy & Co. brokerage account, which was introduced in evidence, shows that no such sale took place. With respect to this item, therefore, respondent's determination is disapproved. As to the rest of the securities sales in 1968, the determination is approved. B. For the year 1969, the evidence, plus respondent's concessions as to costs, establishes the basis for our *381 findings with regard to the sale by petitioner in that year of $24,500 worth of stock of Dumont as well as the stock of Silver Mac. As to the additional $5,500 worth of Dumont stock as well as the National Food Marketers stock, as determined by respondent in his notice of deficiency, there was no evidence, and respondent has omitted this from his requested findings of fact, which we interpret as a concession on respondent's part as to these items. In other respects, therefore, respondent's determination of securities sales in 1969 is approved, in accordance with our findings of fact. With respect to respondent's determination of additional income from unidentified bank deposits for the year 1968, petitioner simply offered no evidence of any sort on this point, and respondent's determination must therefore be approved for failure of petitioner to carry his necessary burden of proof with respect thereto. In this connection, however, we note that respondent went to considerable lengths, which we find convincing, to demonstrate that such unidentified bank deposits did not come from the proceeds of stock sales so as to cause a duplication of income against petitioner for 1968. We *382 turn now to the issue of respondent's determined additions to tax for fraud against petitioner for both years, under the provisions of section 6653(b). Here, the burden of proof is upon respondent to show fraud by clear and convincing evidence, sec. 7454, Rule 142(b). Fraud, as used in section 6653(b), means actual intentional wrongdoing. . The intent required is a voluntary, intentional violation of a known legal duty; in this case, to evade a tax believed to be owing. , cert. denied ; , appeal dismissed (5th Cir. 1977). Where direct evidence of fraudulent intent is not available, its existence may be determined from the conduct of the petitioner and the surrounding circumstances. . The Supreme Court has stated that an "affirmative willful attempt may be inferred from * * * any conduct, the likely effect of which would be to mislead or conceal." Cf. . *383 Considering all the evidence in this case as a whole, we are satisfied that respondent has carried his necessary burden of proof on the fraud issue as to both years. We are satisfied that in the transactions which we have described in our findings, Contento acted under the control and direction of petitioner, and as his nominee; that she had no funds of her own; and that petitioner used her to screen his receipt of income from sales of securities which he owned. The evidence shows that petitioner was a mature and sophisticated businessman, who at one time had held a high position with a major company. We think that he knew exactly what he was doing and what he intended to accomplish, which was the evasion of income tax on substantial income in both the years 1968 and 1969. In the face of clear and convincing evidence to this effect, we find his bald-faced denials at trial singularly unconvincing. For the years before us, the precise amount of underpayment resulting from fraud need not be proved. . The statute requires only a showing that "any part" of an underpayment results from fraud. We accordingly sustain respondent *384 on the fraud issue. Given our disposition of the fraud issue, respondent's alternative claims for additions under sections 6651(a) and 6653(a) need not be considered. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. In addition to the above determinations, respondent determined additional income against petitioner for the year 1979 as unreported rental income. Although such item was placed in issue by petitioner's petition herein, the matter was addressed neither at trial nor on brief, and is deemed to be conceded.↩
3. Contento testified that she received about 80,000 shares, using a round figure. Petitioner testified that he caused his shares to be divided equally, with one half being put in the name of Contento. We accept petitioner's testimony on this point as being more precise.↩
4. Conceded on brief by respondent.↩
5. See n. 4, supra.↩
6. Respondent on brief conceded a cost basis of $600 in this stock.↩
7. Respondent on brief conceded a cost basis of $100 in this stock.↩
8. Respondent on brief conceded a cost basis of $100 in this stock.↩
*. [Merill, Lynch, Pierce, Fenner & Smith]↩